The case on the docket is, you may have mispronounced this, Ahle v. D. Chandler, Inc., 5-10-346, with the appellant, Mr. Keefe. Yes, sir. If you may proceed. I'd like to report something today. It's just that right in front of the courthouse, all of the years I've been coming here, I never realized that right in front of the courthouse there's a space that no one parks in. And I looked, and I looked, and I didn't see a sign that said no parking. And so I parked there. And I was quickly admonished by the courtroom staff that I had hit the scanner because I had parked illegally because apparently it's a one-way street right in front of the courthouse. So I would like to acknowledge the efforts of Mr. Brodsky, who's the author of these briefs, who just beat the cops. Because the Mount Vernon Police Department arrived just as AJ was leaving the scene with my car. We always appreciate skilled counsel. I couldn't understand why that space was always open. It was for Lincoln to his park as well. That explains a lot. But anyway, I owe it all to AJ. This case is really interesting. And I have to give footnote credit to my son Tom because my son Tom and I were talking about this case last night. And it's unusual to get a case where the brief is so short and the record is so short. I mean, it's just maybe it was how Abraham Lincoln was able to track 3,000 cases is that these cases were pretty simple. And we're looking at this case last night because you think to yourself, now, what's happened here? I mean, the first thing is, is you've got a lawyer and the lawyer is representing a gentleman by the name of Mr. Ali. It was my claim in this case. And the guy is involved in a field accident. And he's apparently hit by a guy who's got insurance through State Farm. But the guy is also, correct me if I'm wrong, through Allstate. But the guy is also insured by State Farm, who is his employer, who is apparently a pizza man. And then the guy settles with the driver and then files a lawsuit. And then, lo and behold, here comes the guilty motion. And you're thinking, well, you know, and then there's a motion comes and they say, well, there's a stop. There's a promissory stop. And then you get in and you read the briefs, and the briefs are talking about issues about whether or not the claims person, Ms. Rollins from State Farm is represented to Mr. Donahue because she indicated it's just that her insurance policy was excess and that the Allstate policy was primary. And then that in turn led to this confusion. And then the reason Mr. Medesky says is that, you know, is Ms. Rollins supposed to be practicing law for Mr. Donahue? And you might say, well, where's the skin in the game? Because, you know, the place probably wouldn't be all right is that either the place would have a case against the lawyer, or it would have a case against State Farm, let's just be honest. But here's where the problem is. And when we talked about this, my son and I, last night, they got too anxious, judges. This is a summary judgment motion. This is a summary judgment motion, and they got a little too anxious because every reasonable inference has to be drawn in favor of this point. Who, incidentally, would prefer to recover against Chandler as opposed to recover against the lawyer who did the right thing, stepped up, withdrew, and pulled on us. And the reason that there's a material issue of fact here is because of what the issue is. The issue is whether or not the misrepresentation was an agreement to forego government. And that's where it slipped, because if you really look carefully at the evidence, I kept looking at these affidavits last night, there's never been a deposition taken. I mean, I think they jumped the gun by going for summary judgment. It's important to understand this. I think that part of this argument has to do with, well, was it excess? Was it primary? Was it this? Was it that? Implicit in this entire argument, the misrepresentation or the so-called basis for the estoppel is whether or not they had an agreement or an understanding that they weren't going to enforce government. Because, as Mr. Podesta so harshly points out, there's a presumption that everybody knows the law. There's a presumption that not only is Mr. Donahue supposed to know the law, Mr. Podesta says in his briefs that, well, we're supposed to have an insurance adjuster who can tell the lawyer how to practice law. No, that's the point, is that they both understood that there was this issue. But because of this unique policy situation where you've got one primary and one is excess, it's just that I think that there's a real material issue as to whether or not, in this case, this insurance adjuster along with Mr. Donahue both understood that they were not going to be applying Gilbert, get rid of the off-state policy, and we'll take it from there. And let me tell you why I think that there is a genuine issue of material fact on that. It's just that if you both look at everything that we have in this file, and unfortunately there's no deposition. That's why I think some of the judgment is improperly granted. But if you look at her affidavit and you look at what the record is, this so-called common law record, it supports this. It supports the proposition that she and me were talking about waiving Gilbert. And the reason that you can draw that inference is because if you look at these letters that were exchanged between the insurance company and Mr. Donahue is that it tells that story. The first one says July 30, and the State Farm lady says, I've been assigned to complete the investigation and evaluation. I'll be in touch. Donahue then writes a letter, and he sends it to both insurance companies. Sends it to both of them. And in that letter, it's important to note this because this is subtle, but in that letter he says, I'm attaching everything. You know, I mean, here's the police report, here's the medical record. That appears at page 55 of the common law record. And he makes his demand to both of them. Then at that point what happens is he gets a letter from the lady at State Farm. And she says, as I previously explained, the State Farm policy, as I previously explained, the State Farm policy would be access to the liability coverage provided by all state insurance. Insurance follows the car in the state of Illinois. There is nothing inconsistent with that premise that they both talked about, knew and understood, that there's going to be a Gilbert issue here unless they had agreed that there wasn't going to be a Gilbert issue. And then he goes and says, if and when the all state liability insurance is exhausted, will I then be required to reduce additional consideration of payment as an express policy? So the overriding thing, which was addressed in the brief, which is almost there but wasn't emphasized enough, was this notion of exhaustion and primary access. But implicit in that, and this is where the estoppel attaches, is that implicit in that is that there's certainly a genuine issue to affect whether there was an agreement or an understanding between that lawyer and that insurance adjuster that we were not going to be applying Gilbert. Is that what the attorney says? The prior attorney? No, that's the union. The prior attorney doesn't say it because he was careful with his affidavit. What the prior attorney did, he said it loud and clear. You know how he said it loud and clear, Your Honor? He withdrew. Remember, he's doing this case, if you go through that record and you see, then at that point he gets the offer of the 100 grand, right? He tells the state farm lady, I got the 100 grand. The state farm lady says to her at that point, he writes her, he says, ma'am, I got the 100 grand. And then you get to the next letter. And it says, she says, provide me proof of the all-state liability limits. Right? He does. And in addition to that, confirmation to attend to the policy limits. What's the next letter? The next letter is, he writes her a letter, and he says, enclosed is the offer of the policy limits, and here's the insurance policy. Writes her another letter, May 15, and she says, provide me with all supporting documents of your client's injury claim. He'd already done that. That was the first letter he wrote. This is where it gets slick. Was the prior attorney duped by state farm agent, or did he admit to his negligence? Didn't admit to his negligence. He was duped. And I think duped is probably a pretty good word, but I'm going to tell you that the evidence of that duping is where it gets really interesting. This is where it gets slick. But look, she then asks the second time, send me more supporting documents. He'd already sent them. Sends them again. Remember, a statute of limitations has come up, and you've got a client who wants to get paid. So then what happens is he sends him all the medical records again the second time he sends everything. Right? Now, it's better. The next letter is, he then writes her another letter, and he says, look, when are you going to make an offer? Why would he keep saying when are you going to make an offer if they hadn't had an agreement she was going to make an offer? This is where it gets better. Then he sends her a social security decision. He says, look, he's a co-operative. Now, she already knows at this point that he's already gotten an offer from Allstate. He's tendered it. They've tendered the policy limits, and he's sent the policy. And then at this point, the guy's got a client. He's not hearing anything back from State Farm. The guy's client needs money. He goes ahead, and he takes the 100 grand. But here's the kicker. This is so good. The last letter from the State Farm person. The last letter, the last State Farm letter. The person from State Farm doesn't have the release yet. She hasn't seen the release. That's according to her affidavit. That's why her affidavit is so carefully written. It's well done. Almost. August 6, 2009. Here's the letter. It says, please refer back to my letter I sent to you of June 23, 2009. Upon receiving your request of information, I will complete my evaluation of your client's injury claim and make an offer to settle. Now, here's why that's so good. This is the third time she says, send me the benefits, send me this. She's waiting for the release. That's where the estoppel is. Why would she say, send me this stuff that he has sent twice already, if in fact there was not at least a genuine issue of material fact as to whether or not, whether or not, that's what happened. And everybody got hung up on this. Look at her affidavit. See, if you compare Donovan's affidavit, and I know it's unequal for a guy who's standing here saying, you know, veracity of the lawyer, veracity of the insurance company, I'm not going to replace these us lawyers except for him, you know, or prepare our kids, but this guy Donovan, he spoke volumes because then he at that point takes the money for his client because he's never heard anything after this woman has said, send me this, send me this, send me this. Statute's about to run and the client needs his money. So what do you think he does? He files a lawsuit. When he files a lawsuit, what do you think they do? They file a motion to dismiss based on Gilbert. When he gets the Gilbert motion, what do you think Donovan does? He withdrew. That's the first time he knew he was going to get hit with a Gilbert motion. Maybe he checked his own insurance policy. I'm sure he did that. I'm sure he did that. And, you know, and I agree with him. I mean, that's why I say where's your skin in the game? The skin in the game is the justice. I mean, there's the justice issue here because if you look at his affidavit, he is very careful. Everything he says in his affidavit, rather than look at it, and it's a luxury having cases that doesn't, isn't this fact. Everything in his affidavit is verified by the court of law. Everything he says is verified. Now, let's look at her affidavit. Her affidavit, there's no verification. She says, quote, I never discussed obtaining a release of any party with Mr. Donovan. First place, that's not inconsistent with executing an issue of material fact as to whether or not there's an estoppel based upon an agreement that they'd entered into that there was going to be no guilt. That's not inconsistent. I never told Mr. Donovan to obtain a release from Allstate. That's not inconsistent either. I mean, there's nothing inconsistent about that. And then he says, I never told Mr. Donovan that State Farm required to sign a release before I would make an offer regarding State Farm policy covering Mr. Cameron. That's not inconsistent. It's interesting that none of these assertions appear anywhere in the correspondence, which is the common law. In terms of useless exhaustion. We'll talk when... They talk about exhaustion. And it's just, you know, if we're going to presume everybody knows the law, as Mr. Donovan says that we are, why is it that we don't presume that the State Farm, who handles these cases all the time, doesn't know the law? Well, there's no claim by anybody of any express agreement. No sir. I mean, so your argument is that under the facts, as the trial court had them, there is a reasonable inference. There's a reasonable inference, but moreover, not only is there just a reasonable inference, there's no depositions. I mean, we have right now the question, they felt the gun, they were too anxious. I mean, they wanted to get their summary judgment right away. But the problem is that if you take the position that you do, that summary judgment, that all reasonable inferences are resolved in front of the plaintiff, is that there's nothing in this record that contradicts or eliminates that question of fact. That was never addressed anywhere, and it's completely consistent. And I would suggest to you the consistency, just to get back to your point, is what Donohue did. I mean, if Donohue... Why would Donohue, if he... I mean, it's just as reasonable to believe that he understood that they had this agreement, particularly when you think about primary policy, access policy. It's an unusual situation, you don't have this. But it's just as reasonable for him to think that that's what he did. Otherwise, why would he file a suit? Why would he file a suit, and then as soon as he gets a Gilbert motion, withdraw, turn the file over to another lawyer, and, yes, Your Honor, Paul is insured, because of just that. Or, I should say, I believe that's what the evidence will often show. Right now, in the posture of this case, we don't even get a chance to do that. We should just call it a sober judgment. And that's even without the benefit of a deposition. Heck, I wouldn't have been hired to argue this case on appeal. I'd love to take the deposition of Maurice Collins and say to her, just like, you know, just like... Remember how Ricky would always say to Lucy, Lucy, you've got some suspending to do. I mean, I think that there should be some serious explanation here. And I think, at a minimum, sober judgment is improper. And I think that this is a case that a jury should decide. And, again, because I want to properly footnote it, is that, you know, a lot of this argument, you know, is that... I got it from talking to my son yesterday. He said, well, Dan, what about this? And it occurred to me, he said, you know, the excess, the primary, all of that. Yeah, that's kind of there. That's true. That's implicit. But you've got to dig a little bit deeper to get to what I believe the evidence could be if we've got a case to develop. Donahue doesn't say in his affidavit whether he realized this was the law or... Judge, he doesn't. That's why I... He doesn't say either way. No. Because his actions speak louder than his words. And that's where I think. Withdrawing couldn't mean he went, oh, my God, I messed up. It could have. But isn't that what we talk about, questions of fact? We're here on summary judgment. That's exactly right. You haven't made my point, Your Honor. He could have done that. You know, like the... I can tell you what he does to my wife. Should have had a B.A. I got a B.A. But, no, see, he says here. He said, you know, his affidavit says, you know, I put my conversations, I notified and informed, I sent correspondence. I did that. Everything in his affidavit is corroborated by this record. Not a copy, not her affidavit. But then he says, he says, I would have not settled the claim of the law state if I had any inclination that State Farm would object and or disapprove of the settlement of the law state. And, of course, why would he? He'd made a $400,000 demand. And it's just as reasonable to assume the lady from State Farm said just that. And that is what she said. And, you know, they both understood. If that's the reality and there is this presumption, then I think that summary judgment... I don't know that we're going to win. The jury might think, oh, come on, you know, you're full of oil, you're a lawyer. But the reality is summary judgment we're talking about here. And there is a reasonable question of fact which I think could be litigated in this instance. And Mr. Donahue might say, hey, we talked about this. And she might say, well, we did not. And then somebody had to ask her, well, ma'am, are you aware of Gilbert? Do you understand Gilbert? Because if you understand Gilbert and you understood that this money had been tendered and you kept asking and re-asking for the same material that you had in the first letter, wouldn't the jury conclude that you're stringing him along to get the release? And then you're going to pull the plug on him? It's a reasonable possibility. And is that why? But she hasn't answered the question of why she keeps asking for the same medical over and over again. Is there a copy of his affidavit in the brief? Yes, sir. It appears in the record at pages 68 and 69. And her affidavit... Her affidavit is attached to the appellate's brief. I haven't seen his affidavit. And then, really, the letters really tell a pretty consistent story. And as I say, if I want to believe the actions to be flouted or not, I think that's by the guy. Which I think is kind of interesting, having you speak a puzzle. Unless you're a judge, don't park in front. Thank you, Your Honor. Very much. May it please the Court, Counsel. My name is Mike Badesky. I'm representing the appellee, Dee Chandler, in this case. Mr. Keith argued that there's some dispute here, apparently, as to some inference. But I think if the Court reviews the record in the file, there's absolutely no dispute as to any material fact. And there's no possible inference that he could be raised about waving Gilbert here. We have the affidavits of both Larise Rollins, the State Farm Adjuster. We also have Mr. Donohue's affidavit as well. We also have all of the correspondence that's been exchanged between Mr. Donohue and Larise Rollins. The correspondence starts at C-55 and it ends at C-67. When we file a summary judgment here, Your Honor, I attach the affidavit of Larise Rollins that's been referenced by Mr. Keith. She says right in her affidavit that there was never any discussion of a release. That affidavit is uncontradictive. If there was a discussion of a release, if there was any discussion about I'm going to go ahead and take all State's money, we're going to have a release, is that going to be okay? I would imagine that there would be some contrary affidavit by Mr. Donohue. We had this summary judgment on file for some time before it came up for hearing. I think it was even continued a time. I don't understand how you could possibly have any type of inference about waving Gilbert, which is the issue which would come up if you had a release. How could you have an inference about waving Gilbert if you never even discussed the release? I mean you have to have a release to have a Gilbert issue. If the release wasn't even discussed between the two, this is the release with all State, how could you have an inference about waving Gilbert? How could that even come up in the case? What about telling plaintiff's counsel I'll talk to you when you exhaust the all State policy? Exactly, and that's exactly what the case is saying. There's no dispute here as to the law either. All State is primary, State firm is going to be excess. You could use the term exhaust, but if you're making a demand for $400,000, you have to have that primary carrier say we're going to tender our money. Now you don't sign a release saying I'll take $100,000 when your client's damaged $400,000. Does an offer exhaust the policy limits? The policy limits are exhausted when the insurance carrier says I'm tendering the full policy limits. At that point, and that's what Louise Rollins asked for, she wanted proof that All State had tendered the limits. That's the exhaustion. There's no more All State policy available. My paycheck is exhausted when I've spent it all, when the money's gone. You understand what I'm saying? Sure. Aren't we kind of parsing words a little bit? I mean when somebody says exhaust me, that could mean easily it's gone, it's paid. Well, that's what the case is saying. I cited the case from this fifth district about when an excess carrier has a duty to get involved in the case, to make an offer, to defend. The primary has to be exhausted. I mean that's what the term means. Exhaust means to be. I mean this isn't, you know, we're presumed to know the law. What I'm trying to say, Your Honor, is what Louise Rollins asked for, and we have the letter here. And again, you know, we can do depositions. The case could be remanded. Nothing's going to change about the facts because we've got both affidavits. We've got all the letters. Nothing was discussed about any release. That's not going to change. Like I said before, what the estate firm adjuster asked for was proof of All State liability limits. This is C-60, and confirmation they have tendered their policy limits. That's what she asked for. He sends that to her, and his letter. He sends a letter saying, hey, they offered the money, and she says, well, give me the proof. I've not received the medical rec. Okay. He sends her the letter. Check that. This is May 13. Ms. Rollins enclosed this correspondence from Ms. Sharon Judy of All State regarding All State's offer of the policy limits of $100,000. And we have the Sharon Judy letter. That was April. By the way, that letter he sends to Rollins is C-61. And the Sharon Judy letter is also included. That's C-58. And it says, Mr. Donahue, this will confirm I have tendered the policy limits of $100,000 to settle the bodily injury claim of David Ale. So he sends that to her. Now, what is her response? Is her response, hey, you've got to have a release, or I want a release, or, you know, you can go ahead and take the money and get a release. Don't worry about the effect of the release. It's not. All she asked for is medical records. Now, I don't know if he sent them to her. I don't know if she got them and they were misplaced. I don't know if they got put in a different file or if she lost them. I don't know. But what we do know is this. She never said anything about getting a release. She said, if you send me the medical records, I'll evaluate them. He doesn't know what the offer might be. If there's going to be an offer, she has to evaluate the extent of the injuries because there's already $100,000 being tendered. The question is how much more is the case worth? I haven't had a chance to see the record yet, but was the State Farm agent adjuster notified after he obtained, after the release was signed that that had been done, but before suit was filed? I mean, you understand what I'm getting at? How did the State Farm come to find out that the case with Allstate had actually been settled? She didn't. Well, and it's in her affidavit. She didn't know that there had been any settlement until she received a signed copy from him. I don't know. So Mr. Donahue sent it to her. That's my question. Did he send it to her? He sent her a letter and said, we settled? I don't know the answer to that, that I don't know. But the point I'm trying to make is she didn't receive a copy of the release until he did. That's what her affidavit says. I had no knowledge of the release signed with Allstate until I received a signed copy of the release from the attorney. I mean, that's the last paragraph in her affidavit. And I guess my question about that is, did that come in a letter and did she respond and say, hey, I never told you to get a release? Or was the first notice that they were asserting the defense, the farm, was by filing a motion to dismiss after he filed the suit? I don't know if this was before or after. I think it was after the lawsuit was filed because the statute was going to come up on August 9th. And I'm just asking because I don't know the answer. Right. And I think her last letter to him was August 6th. Now, again, she doesn't ask for a release and her affidavit is uncontradicted. They never even discussed any release. If they don't discuss a release and she doesn't know he's going to enter a release, there can't be any inference of waiving Gilbert. There has to be an inference of waiving Gilbert. There can be only one potential inference of waiving Gilbert if you know about a release. He's clearly making a demand in excess of the all-state policy limits. I don't see how there could be any reasonable inference that she would think that he would sign a release that says his client is accepting $100,000 to waive the claim. I mean, why would there be an inference that she would think, well, okay, he'll go ahead and make this claim for the state farm policy or money on the state farm policy, but he must have signed a release to release the torch feeser. That doesn't make any sense. I mean, if the guy was making a claim for the state farm policy, why would the adjuster think there's some release out there that releases the person? I mean, it just wouldn't make any sense. If she had the release or knew about the release, she would have written a letter to the guy saying, hey, you released the guy. She wouldn't ask for more information. She would say, I'm not interested in any information from you. You released this person. We don't owe you any money. And the last letter is August, like I said before, it's August 6th. She wouldn't say, upon receipt of the information, I will complete my evaluation and make an offer. She would say, I'm not going to make you any offer. You signed a release. I mean, why go through this process? I mean, but what if her deposition was taken and she said, I was hoping he'd get a release. That's why I kept asking him for medical records and that sort of thing. You know, I was hoping he'd go ahead and release the case because then we're off the hook. What if she testified to that? I don't know what her hope would have to do with an inference or how he should have kept it. Let me rephrase that. What if she said, that was my plan. I said, exhaust the policy. And, you know, I was hoping he'd go ahead and get a release because then we're off the hook. Would that make any difference? I don't think so, unless she communicates something to him that puts him, confuses him or somehow lures him into thinking. I mean, she has to communicate to him or estoppel to apply, she has to do something that he has to reasonably rely upon to his detriment. She did nothing here. She did nothing here. There was no communication. That's undisputed, Your Honor. Her affidavit is uncontradicted. He signed an affidavit as well. In fact, this affidavit really hasn't been talked about. But he says on page, or at C68, I construed State Farm's April 13, 09 correspondence and subsequent silence as acquiescence and acquiescence as confirmation to settle the claim with Michael White Law's insurance company Allstate. The letter of April 13 and subsequent silence. What does that say? She didn't say anything to him. Well, if she didn't say anything to him, he can't detrimentally rely upon something she said. It just doesn't work that way. If there's no communication from her end, how can there be some agreement or inference to White-Gilbert? How can there be some assumption that he can rely on, but communication by her? There has to be some detrimental reliance for Estoppel to apply. She has to say something to him. Hey, go ahead, sign a release. No big deal. You can go ahead. You can take the money. Sign a release. We're not going to, you know, we won't make anything of it. It's okay. No big deal. Her affidavit is uncontradicted. She never said that to him. There was no discussion between the two. And if there was discussion, you better believe there would be an affidavit from him. There was no affidavit. We filed that affidavit with our summary judge in motion. There can't be any inference of something that just didn't even happen. And that April 13 letter that he references. Okay. Well, it was dated April 13. It's actually in May. I'm not sure what he's referring to there. But the point is she never sent him a letter, any communication, with regard to a release or any knowledge about a release or accepting all state's policy and signing a release of Mr. Whitewap. What I was getting at, Your Honors, is, you know, this is not, this particular factual scenario is not something that's extremely unusual or bizarre. I mean, there's two policies that apply. Mr. Donohue knows, hey, you know, I've got a client that has these injuries. He's going to be making a claim for an excess of the all state policy limits. Well, you can't sign a release to accept the $100,000 policy limits and release the driver and expect to get additional coverage on some other policy. But I think he knew about that. I mean, he knew what he was thinking. He knew what the issue was, and he knew there was going to be a potential problem. We know that. Because we have a stipulate. First of all, two things. We have the release that was signed, and it's on C-34. And this is very telling, Your Honors, because it proves, I think, and it shows there's no inference of waving Gilbert. Release of all claims, $100,000, the undersigned release is Michael Whitewap, all state insurance for all injuries, so on and so forth, for the accident that occurred August 9, 2007 at or near Old Troy Road in Edwardsville. Then there's something written in ink, excluding pizza man Dennis Chandler. And that was admitted that Mr. Donohue, by our stipulation, Mr. Donohue wrote that. Well, why did he write it? Did he write it because, you know, there was a waiver, or he thought there was a waiver of Gilbert and it was no big deal? No. There was no waiver of Gilbert, and it was a big deal, and he was concerned about it. Why was he concerned about it? Attorney Donohue wrote the words, excluding pizza man Dennis Chandler on the release in an attempt to avoid the release from barring plaintiff's personal injury claim against Chandler in Chandler's capacity as an employee of Michael A. Whitewap. He was concerned about that issue. He was concerned about the Gilbert issue. He knew about it, and he wrote it on the release. If there's some inference that, hey, you know, they had an agreement, it was going to be no big deal, don't worry about it, I can get a release, he would have no reason to put that on the release. He would have no reason to do that. You think he put that on there thinking that that would cure whatever Gilbert issues were there? Absolutely. I mean, that's what his stipulation says. That's what we agreed to in the stipulation. And it didn't. I mean, the Supreme Court says that doesn't work. So he knew about the issue. And there's absolutely no inference to suggest that everything is going to be fine with State Farm. Don't worry about it. If there's an inference and he had an understanding that there was no Gilbert issue, everything was going to be fine, the guy's got no reason to put that on the release because he's got an understanding with the adjuster. Well, and if he knew what the issue was and what the law was, he'd know that putting it on there wouldn't do any good. Well, I can't speak for his legal knowledge, but all I can speak for is the reason why he put that on the release. He was trying to accomplish something, point out or confirm that the claim was still reserved against the person he wanted to exclude for some reason. Right. Is it your point that if they did, in fact, have an agreement, there would be no reason to put that language down there? Right. There would be no reason to because if he had an agreement with her, why would he be concerned about it? He would file a responsive affidavit saying, yeah, I discussed it with Rowlands, and she said go ahead and get the release. Then we have an issue of fact. Then we wouldn't have a summary judgment. I mean, again, it's right there in her affidavit. She never discussed it with him, never told him to get a release. First time she found out about it was after he had completed it. If any of that stuff was untrue, you better believe you would have had an affidavit from Mr. Downing saying, no way, we talked about it and what I did was fine. Then we have an issue of fact here. But what we have here is an argument of some kind of an inference about something that was never even talked about. I just don't see how you can get an inference when the release was never even discussed and it's undisputed, undisputed that the release was never even discussed. Like I said before, this case could be remanded. The court wanted to do that. We could take depositions, but nothing is going to change. Nothing is going to change about any of the facts, because the facts are undisputed. We've got affidavits from both parties. This involved just two individuals negotiating with each other. We've got their affidavits. We've got all of their letters going back and forth. They don't contradict each other. What they have to say does not contradict. None of the letters contradict each other. So there's no dispute as to any material fact, and I just don't see how there can be any reasonable inference of any kind about Wade and Gilbert when they never discussed the release. I just ask that the trial court be affirmed. Thank you. Thank you, Your Honor. I don't know what you're talking about. I mean, what is this with the release? Judge, first off, that's right. Every time you ask a question and he says, I don't know, that tells me question fact. And he must have said, I don't know. What was Mr. Donohue thinking? I don't know, question of fact. What was the insurance adjuster thinking when she did this? I don't know, question of fact. Look, let's look at her affidavit. Here's a great question of fact. Her affidavit, the last thing. I had no knowledge of the release, Mr. Allen's son, until I received a signed copy of the release from Attorney Donohue. Why don't you tell me where in your record there's any evidence that Mr. Donohue ever sent her a signed copy of the release, and more importantly, when? Because that's extraordinarily relevant to the entire issue of whether or not he got, to use your words, duped. The addition of that language, the addition of that language is just as consistent with the opposite interpretation as is suggested by Mr. Podesky, just as consistent. Whether they were thinking about Gilbert, he's got an agreement with her. How does he know that she's not going to get fired anymore? How do we know? How does anybody know that she's not going to get hit by a truck anymore? I mean, there is just as much of an equal inference if he adds that language because he had an agreement with her as it relates to Gilbert. It's just as reasonable if you're talking about summary judgment. He says here, he doesn't talk about a release. It's not about a release. It's Austrian, it's about a settlement. And you talk about the tendering, the money. Why does she keep asking over and over again for the same material? And on top of that is that up here, he is going to have to explain to you who you have to depose her. I mean, look at this. He writes her the original letter on May 13th and gives her every medical record, every medical bill, and the police report. That's on May 13th. He got all that. But he sent it to her even before that because then he sent it to her again on May 18th. And then on top of that, then she says, well, I want to, and then he says, they've tendered me the policy. And then she says, send me the policy and send me proof of that. He does that. He sends her a Social Security award. I mean, and it keeps on going. And then the final thing, the third time she's asked me for the medical records in August. It's a reasonable inference that she's waiting for the release, which I think is really interesting because she says in her affidavit that she got the release. Where? Where is it in the record that she got the release? And when did she get the release? I certainly agree with you. It's a reasonable effort. Give me that release, dude. As soon as you give me the release, I'll pull the plug. There's a genuine issue of material fact here that could be fleshed out. And I'm glad that you're suppressing this because he could just tell us, he said, don't bother with discovery because nothing's going to change. Well, you know, that's why we have discovery, to see what the true evidence is. Why are you so afraid of having your adjuster deposed? Was there any request for additional discovery? Judge, I wish I could answer that question, but you know why I can't? There's no record. And that's because he was in such a hurry to get here with his summary judgment motion. There's no record of the proceedings. I would have thought they'd gotten the record. And it's summary judgment. And he's got to determine whether that. But look, he keeps saying that Mr. Donahue never addressed that whatsoever in his affidavit. Heck, yes, he did. What do you think it means? And it's him. He wrote his affidavit about six or nine months before she wrote her affidavit. He says, I would not have settled the claim with Allstate if I had any inclination that State Farm would object and or disapprove of the settlement with Allstate. Doesn't that tell you something? Wouldn't that suggest to a reasonable person that he had an agreement with this woman? Get your $100,000, move on, and we'll take care of that, lest there be any doubt about that? The last letter that they put in the file is the one that is really the killer. And that's the one that says, as we've discussed, Your Honor, on August the 5th, give me that release. Give me that release. Where's that release? And then it says, once you give me the release, as it says, I will complete my evaluation of my insurance and make an offer to settle. The letter says, once I get the release. It says no. No, that's it. I just want to make sure. She never asked for the release. I understand. I understand. And she keeps asking for the same records over and over and over again. And then she claims she got the release. Well, when? Not a question. A fact. As it goes to whether or not there's an assault here, isn't it? We don't know. And does everything get perfect? No, it doesn't. Thank you. I enjoyed it. It was a lot of fun. Thank you both for your briefs and your arguments. We'll take this matter under advisement.